UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **IN RE:** | |
| **EX PARTE APPLICATION OF ALONSO ANCIRA ELIZONDO FOR AN ORDER TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782** | Misc. Action No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF ALONSO ANCIRA ELIZONDO'S
*EX PARTE* APPLICATION TO OBTAIN DISCOVERY FOR USE
IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................2

    A.  Alonso Ancira Elizondo and AHMSA .................................................2

    B.  Allegations Underlying the Arrest Warrant ..........................................4

        1.  Overview........................................................................................4

        2.  The Contracts for Mr. Lozoya's Advisory Services .....................4

        3.  The Alleged Transfer to Purchase Real Estate .............................6

        4.  Agro Nitrogenados Sale ................................................................6

    C.  The Mexican Criminal Proceeding and Spanish Extradition Proceeding...............8

        1.  México's Issuance of the Arrest Warrant, Freezing Order and Request for an Interpol Red Notice .............8

        2.  Mexican Authorities' Failure to Afford Mr. Ancira Due Process in Issuing the Arrest Warrant .............8

        3.  Mexican Federal Court Decision Declaring That the Criminal Complaint Against Mr. Ancira Was Time-Barred........................9

        4.  Status of the Mexican Criminal Proceeding ...............................11

        5.  The Spanish Extradition Proceeding............................................12

III.  REQUESTED DISCOVERY ..............................................................................13

IV.  ARGUMENT......................................................................................................17

    A.  Legal Framework..................................................................................17

    B.  The Applications Meet the Statutory Requirements of Section 1782....................19

        1.  UBS "Resides" or Is "Found" in the District of Connecticut ...................19

        2.  The Requested Discovery Is "For Use" in a Foreign Proceeding.............20

        3.  Mr. Ancira Is An "Interested Person" in the Foreign Proceedings...........24

    C.  The *Intel* Discretionary Factors Weigh in Favor of Granting the Application......................24

        1.  The First *Intel* Factor Favors Granting Discovery .....................25

        2.  The Second *Intel* Factor Favors Granting Discovery ................25

        3.  The Third *Intel* Factor Favors Granting Discovery ...................27

        4.  The Fourth *Intel* Factor Favors Granting Discovery..................29

V.  CONCLUSION...................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Brandi-Dohrn* v. *IKB Deutsche Industriebank AG,*
    673 F.3d 76 (2d Cir. 2012).................................................................. 17-18, 20, 23, 28

*Bristol-Myers Squibb Co.* v. *Superior Ct. of Cal.,*
    __U.S. __, 137 S. Ct. 1773, 198 L.Ed.2d 395 (2017)............................................. 19

*Certain Funds, Accounts and/or Inv. Vehicles* v. *KPMG, L.L.P.,*
    798 F.3d 113 (2d Cir. 2015)........................................................................... 22

*Euromepa, S.A.* v. *R. Esmerian, Inc.,*
    51 F.3d 1095 (2d Cir. 1995)........................................................................ 18, 25

*Goodyear Dunlop Tires Operations, S.A.* v. *Brown,*
    564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011).................................... 19

*Gushlak* v. *Gushlak,*
    486 F. App'x 215 (2d Cir. 2012) .................................................................... 1

*In re Accent Delight International Ltd.,*
    869 F.3d 121 (2d Cir. 2017)....................................................................... 17, 23

*In re Application of Operacion y Supervision de Hoteles, S.A. de C.V.,*
    No. 14 Misc. 82, 2015 WL 82007 (S.D.N.Y. Jan. 6, 2015)...................................... 26

*In re Bayer AG,*
    146 F.3d 188 (3d Cir. 1998)........................................................................ 27, 29

*In re Berlamont,*
    773 F.3d 456 (2d Cir. 2014)............................................................................ 21

*In re Edelman,*
    295 F.3d 171 (2d Cir. 2002).......................................................................18-19, 29

*In re Grupo México SAB de CV,*
    No. 3:14-MC-00073, 2014 WL 12691097 (N.D. Tex. Oct. 17, 2014) ...................... 26

*In re Grupo Qumma,*
    No. M 8-85, 2005 WL 937486 (S.D.N.Y. Apr. 22, 2005)...................................... 26

*In re Hornbeam Corp.,*
    722 F. App'x 7 (2d Cir. 2018) ....................................................................... 22

*In re IJK Palm LLC*,
No. 3:16-MC-171, 2019 WL 2191171 (D. Conn. Jan. 30, 2019) ........................................ 1, 22

*In re Kidd*,
No. 3:20-MC-0016, 2020 WL 2404928 (D. Conn. May 12, 2020) ........................................... 1

*In re Malev Hungarian Airlines*,
964 F.2d 97 (2d Cir. 1992) .......................................................................................... 30

*In re Mangouras*,
No. 17-MC-172, 2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017) ............................................ 27

*In re Metallgesellschaft*,
121 F.3d 77 (2d Cir. 1997) ...................................................................................... 18, 28

*In re Request for Int'l Judicial Assistance from the Sixteenth Family Court of the
Supreme Court of Justice of the Fed. Dist.*,
No. 14-MC-80083, 2013 WL 1202545 (N.D. Cal. Mar. 19, 2014) ....................................... 26

*In re Sampedro*,
No. 3:18-MC-47, 2018 WL 5630586 (D. Conn. Oct. 30, 2018) ......................................... 17, 27

*In re Samsung Elecs., S.A. de C.V.*,
No. 06-20639-CIV, 2006 WL 8433576 (S.D. Fla. Apr. 12, 2006) ....................................... 26

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019) ................................................................................... 19-20

*Intel Corp.* v. *Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ............................................................................................. *passim*

*IPCom GMBH & Co. KG* v. *Apple Inc.*,
61 F. Supp. 3d 919 (N.D. Cal. 2014) .......................................................................... 21-22

*Medeiros* v. *Int'l Game Tech.*,
No. 2:16-CV-00877, 2016 WL 1611591 (D. Nev. Apr. 22, 2016) ....................................... 24

*Mees* v. *Buiter*,
793 F.3d 291 (2d Cir. 2015) ...................................................................................... 23

*Pfaff* v. *Deutsche Bank AG*,
No. 20 Misc. 25, 2020 WL 3994824 (S.D.N.Y. July 15, 2020) ............................................ 20

*Weber* v. *Finker*,
554 F.3d 1379 (11th Cir. 2009) .................................................................................. 21

iii

**Statutory Authorities**

28 U.S.C. § 1782................................................................................................*passim*

**Rules and Regulations**

Fed. R. Civ. P. 26................................................................................................ 30

## I.    INTRODUCTION

Alonso Ancira Elizondo ("Applicant") respectfully files this memorandum of law ("Memorandum") in support of his *ex parte* application ("Application") for judicial assistance pursuant to 28 U.S.C. § 1782 ("Section 1782").[1]   Mr. Ancira has been falsely charged with money laundering in México and, for over a year since his arrest in Spain, has been fighting (and continues to fight) against a request by México seeking his extradition ("Extradition Request").    The discovery sought herein will support Mr. Ancira's efforts in defending against money laundering charges pending against him in México ("Mexican Criminal Proceeding") and a related extradition proceeding pending against him in Spain ("Spanish Extradition Proceeding").

Mr. Ancira is the victim of a carefully orchestrated retaliation campaign by current Mexican President Andrés Manuel López Obrador against his political enemies.   While the current Mexican government has styled this campaign as a fight against corruption and for social justice, at bottom, that is a mere disguise for settling personal grievances with political rivals.   These politically motivated money laundering charges against Mr. Ancira are baseless, yet have already had a detrimental impact on his liberty and livelihood.   For this reason, Mr. Ancira needs the requested discovery to exculpate himself against those charges.   By seeking this information, Mr. Ancira is demonstrating that he has nothing to hide and wants to prove his innocence.

Mr. Ancira brings this Application seeking permission to subpoena documents and information for use in the Mexican Criminal and Spanish Extradition Proceedings from UBS AG ("UBS"), a non-party bank located within the District of Connecticut, and specifically its

---

[1]     Courts in the Second Circuit routinely entertain *ex parte* applications pursuant to Section 1782. *See Gushlak* v. *Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."); *see also In re Kidd*, No. 3:20-MC-0016, 2020 WL 2404928, at *2 n.2 (D. Conn. May 12, 2020) (quoting *Gushlak*); *In re IJK Palm LLC*, No. 3:16-MC-171, 2019 WL 2191171, at *1 n.1 (D. Conn. Jan. 30, 2019) (same).  This is because an opposing party may move to quash a subpoena issued pursuant to a Section 1782 application, thereby preserving its due process rights. *See Gushlak* 486 F. App'x at 217.

Stamford, Connecticut branch.[2]  Mr. Ancira seeks from UBS documents and information relating to an account at UBS ("UBS Account") through which the payments underlying the alleged money laundering charges were made.  Mr. Ancira will use the documents and information obtained via the subpoena in the Mexican Criminal and Spanish Extradition Proceedings to prove that the funds were transferred to UBS in connection with legitimate contracts for consulting services.

As detailed below, this Application meets both the statutory requirements and the four discretionary factors set forth by the Supreme Court in *Intel Corp.* v. *Advanced Micro Devices, Inc.* 542 U.S. 241 (2004), for courts to consider when determining whether to grant the relief sought under Section 1782.  In summary, they are as follows:  (1) UBS resides or is found in the District of Connecticut; (2) the Requested Discovery will be for use in foreign proceedings; (3) Mr. Ancira is an interested party in the foreign proceedings; and (4) each of the four *Intel* factors weighs in favor of the discovery sought by Mr. Ancira.  Accordingly, the Application should be granted.

## II.     FACTUAL BACKGROUND

### A.     Alonso Ancira Elizondo and AHMSA

Mr. Ancira is a 68-year-old dual citizen of México and the United States and a Texas resident.  He is married and has one daughter.  Declaration of Juan P. Morillo ¶ 5 ("Morillo Decl.").  Mr. Ancira holds a law degree from the Universidad Anáhuac, an elite Catholic university in Mexico City, México; an Honorary Doctorate from the University of the Incarnate Word, a private Catholic university in San Antonio, Texas; and a Honorary Doctorate from Texas A&M University-San Antonio.  Morillo Decl. ¶ 6.

---

[2]     Mr. Ancira seeks to issue a subpoena for documents and information substantially in the form set forth in **Exhibit A** (appended hereto).

Mr. Ancira is the controlling shareholder and Chairman of the Board of Altos Hornos de México, S.A.B. de C.V. and its subsidiaries (together, "AHMSA"), the largest integrated steel producer in México.  He served as the chief executive officer of AHMSA from 1991 until 2004. Morillo Decl. ¶ 7. AHMSA produces and markets flat steel products, such as hot and cold rolled coil and tinplate, wire rods, and reinforcing bars throughout México.  Its products are used in the automotive, construction and oil industries, and are suited for heavy machinery as well as for packages and  household appliances.  AHMSA is headquartered in Monclova, México and is the biggest employer in the State of Coahuila, which borders Texas.  Morillo Decl. ¶¶ 8-9.  In total, AHMSA employs approximately 19,000 individuals and, as of the end of Q1 2020, had over USD 2.5 billion in assets.  Morillo Decl. ¶ 9.

Mr. Ancira is a member of the boards of directors of the (1) American Iron & Steel Institute, Inc., one of the oldest trade associations in the United States; (2) World Steel Association, the international trade body for the iron and steel industry; and (3) Teresa Lozano Long Institute of Latin American Studies at the University of Texas in Austin.  Morillo Decl. ¶ 10.  Between the early 1990s and 2015, Mr. Ancira served as the President of México's National Iron and Steel Chamber ("CANACERO") four times.  Morillo Decl. ¶ 11.  Mr. Ancira is well-known as a philanthropist in Texas's Mexican-American community, notably through his non-profit organization, Mexicans and Americans Thinking Together ("MATT"), which provides education and social outreach programs among other things.  In addition, Mr. Ancira has been closely involved in efforts to restore the Spanish Missions in San Antonio.  Reflective of Mr. Ancira's charitable endeavors and dedication to his community, former Texas Secretary of State Hope Andrade has described him as a "great man, kind and generous."  Morillo Decl. ¶ 12.

**B.      Allegations Underlying the Arrest Warrant**

      **1.      Overview**

On May 25, 2019, México issued warrants for the arrests of (1) Mr. Ancira; (2) Emilio Ricardo Lozoya Austin, a Mexican economist, lawyer and politician and General Director of Petróleos Mexicanos ("Pemex"), the Mexican state-owned petroleum company, from December 2012 to February 2016; and (3) Gilda Susana Lozoya Austin, Mr. Lozoya's sister. Morillo Decl. ¶¶ 14-15.

The arrest warrant against Mr. Ancira ("Arrest Warrant"), as well as those against Mr. Lozoya and Ms. Lozoya, relate to an investigation by the Mexican criminal authorities – including the Fiscalía General de la República ("FGR"), the Federal Prosecutor's Office – regarding, *inter alia*, the following:  (1) payments that AHMSA made to Mr. Lozoya in June and November 2012 pursuant to two contracts, dated March 2012 and October 2012, for Mr. Lozoya's advisory services regarding, among other things, the construction of an intercity train in and around Mexico City; (2) the purchase of an apartment in Mexico City by Mr. Lozoya in November 2012 using funds purportedly from the UBS Account; and (3) the purchase of Agro Nitrogenados, a fertilizer company owned by AHMSA, by Pro AgroIndustria, S.A. de C.V. ("Pro AgroIndustria"), a Pemex subsidiary ("AHMSA Investigation").  Arrest Warrant, 16-31 (Morillo Decl. ¶ 14, Ex. 1); *see also generally* Extradition Request (Morillo Decl. ¶ 20, Ex. 2).[3]

      **2.      The Contracts for Mr. Lozoya's Advisory Services**

Prior to joining Pemex, Mr. Lozoya had worked at OHL México SAB de C.V. ("OHL"), the Mexican subsidiary of Obrascón Huarte Lain, S.A., a Spanish construction and engineering company.   Morillo Decl. ¶ 29.   Given Mr. Lozoya's background in the construction and

---

[3]      Both the Arrest Warrant and Extradition Request have been filed with the court in Spain in connection with the Spanish Extradition Proceeding and are publicly available as part of that filing.

engineering industry, AHMSA retained him to provide advice regarding a project to build a train between Mexico City and Toluca (a city to the west of Mexico City).  Morillo Decl. ¶¶ 28-29.  On March 1, 2012, AHMSA executed a contract with Mr. Lozoya (through a German company called Luximo Wolfsburg Postrabe 6 GMBH ("Wolfsburg")) to provide consulting services for the project ("March 2012 Contract").  Morillo Decl. ¶ 28.

As set forth in the March 2012 Contract, AHMSA paid Mr. Lozoya (through Wolfsburg) USD 500,000 for his work.  On June 12, 2012 and pursuant to instructions in an invoice from Wolfsburg (dated May 1, 2012) and a letter from Mr. Lozoya on behalf of Wolfsburg (dated June 6, 2012), AHMSA sent USD 500,000 from its account at Banco Mercantil del Norte ("Banorte") to an account called Tochos Holding Limited ("Tochos Holding") at UBS in Geneva.  Morillo Decl. ¶¶ 30-31.

In October 2012, AHMSA again decided to retain Mr. Lozoya to (1) provide additional consulting advice regarding the intercity train project between Mexico City and Toluca; and (2) conduct analyses regarding, among other things, the storage of primary materials (e.g., purchased scrap metals) in Coahuila.  Morillo Decl. ¶ 32.  At or around that time, AHMSA was implementing a plan to expand its production capabilities, which would involve substantial increases in the amount of raw materials it received for production and the amount of finished products.  AHMSA thus sought advice regarding the logistics of transporting both raw materials and final products as well as storing raw materials prior to processing.  Morillo Decl. ¶ 33.

On October 25, 2012, AHMSA executed a contract with Mr. Lozoya (through Wolfsburg) relating to his advice on the above projects and, as set forth in the contract, agreed to pay Mr. Lozoya a total of USD 3 million ("October 2012 Contract").  Morillo Decl. ¶ 34.  Between November 1 and November 28, 2012, and pursuant to instructions in a letter from Mr. Lozoya on

behalf of Wolfsburg (dated October 29, 2012) and three invoices from Wolfsburg to AHMSA (dated October 31, November 6 and November 15, 2012), AHMSA sent approximately USD 2.9 million from its account at Banorte to Tochos Holding at UBS in Geneva.  Morillo Decl. at ¶¶ 35-36.  Specifically, AHMSA made these transfers on November 1, November 9, November 16 and November 28, 2012.  Morillo Decl. ¶ 36.

On November 21, 2012, Mr. Lozoya provided written analyses concerning the following to AHMSA: (1) the train project between Mexico City and Toluca, which would involve creating a tunnel through the Sierra de las Cruces mountains and thus required an assessment of the feasibility of construction by engineers specialized in hydraulics and geology; and (2) the consequences of AHMSA's expansion in production on logistics and, notably, the delivery and storage of primary materials.  Morillo Decl. ¶ 37.

### 3.   The Alleged Transfer to Purchase Real Estate

According to the Arrest Warrant and Extradition Request, on November 7 and November 13, 2012, the Tochos Holding account at UBS sent transfers of USD 1.5 million and USD 1.08 million, respectively, to an account at Intercam Casa de Bolsa, S.A. de C.V. in México for the benefit of an individual named María del Carmen Ampudia Cárdenas.  According to the Mexican authorities, these payments were allegedly made by Mr. Lozoya to purchase a house in Mexico City owned by Ms. Cárdenas.  Arrest Warrant at 17-20; Extradition Request at 6-7.

### 4.   Agro Nitrogenados Sale

On November 1, 2013, PMI Holdings B.V. ("PMI"), a Pemex subsidiary, approved allocating USD 475 million to purchase, refurbish and develop Agro Nitrogenados, a fertilizer plant located in Coatzacoalcos, Veracruz, México.  The plant was then-owned by AHMSA. Morillo Decl. ¶¶ 38-39.

On December 17, 2013, the Pemex Board of Directors acknowledged PMI's purchase and refurbishing of Agro Nitrogenados.   Morillo Decl. ¶ 40.   On December 20, 2013, Agro Nitrogenados and Pro AgroIndustria (another Pemex subsidiary) executed a contract relating to the sale for a total of USD 275 million (comprising USD 264 million for Agro Nitrogenados's assets and USD 11 million for the company's buildings).  Morillo Decl. ¶ 41.

On January 16, 2014, PMI executed a contract for both the acquisition and "revamping" of Agro Nitrogenados's assets and publicly disclosed that this would require an investment of USD 475 million.[4] Also in January 2014, the Mexican Comisión Federal de Competencia Económica (Antitrust Division) approved the sale, and Barclays plc issued a valuation report that assessed Agro Nitrogenados's assets at approximately USD 277 million.  Morillo Decl. ¶¶ 41-42.  On May 30, 2014, Pro AgroIndustria purchased Agro Nitrogenados's assets and, in August 2014, executed a contract with Cobra Instalaciones México relating to the rehabilitation of these assets.[5]

---

[4]      *See* Pemex, Form 6-K Filing with the U.S. Securities and Exchange Commission, 16 (March 2014), https://www.sec.gov/Archives/edgar/data/932782/000119312514094963/d689375d6k.htm ("On January 16, 2014, PMI signed an agreement to purchase and revamp assets belonging to the Agro Nitrogenados, S.A. de C.V., including a closed fertilizer production facility in Pajaritos, Veracruz.  This new plant is expected to produce 990 Mt of urea per year.  The project requires an investment of up to U.S. $475 million, which includes the purchase price of current assets, as well as the cost of revamping and renewing the plant.  The expected level of production of urea represents approximately 75% of national demand for urea. Ammonia, one of the main inputs for the production of urea, will be supplied by PEMEX's petrochemical complex in Cosoleacaque, Veracruz, located just 28 kilometers from the Agro Nitrogenados facilities.").

[5]      *See* Pemex, Form 6-K Filing with the U.S. Securities and Exchange Commission, 11 (Nov. 2014), https://www.sec.gov/Archives/edgar/data/932782/000119312514397773/d811944d6k.htm ("On May 30, 2014, Pro-Agroindustria, S.A. de C.V., a PMI Comercio Internacional affiliate, purchased the assets of Agro Nitrogenados, S.A. de C.V.  On August 29, 2014, Pro-Agroindustria entered into an engineering, procurement and construction contract under the Open Book contract type with Cobra Instalaciones Mexico.  The contract is aimed at rehabilitating the assets acquired from Agro Nitrogenados.  Phase I, which will last approximately 15 months, is aimed at beginning operations of first urea production train, which is expected to produce approximately 1.4 tons of urea per day.  Phase II, which will last approximately five months upon the conclusion of Phase I, is expected to place into operation the second urea train.  Together, these trains are expected to produce approximately 990 annual tons of urea.").

C.      **The Mexican Criminal Proceeding and Spanish Extradition Proceeding**

1.      **México's Issuance of the Arrest Warrant, Freezing Order and Request for an Interpol Red Notice**

On May 23, 2019 (two days before México issued the Arrest Warrant), Mr. Ancira traveled from México to the United States to see his daughter in New York.  Unaware of the issuance of the Arrest Warrant, Mr. Ancira left New York several days thereafter for a holiday in Palma de Mallorca, Spain.  Morillo Decl. ¶¶ 13-14.

On May 27, 2019, Mexican criminal authorities announced it had filed charges against MR. Ancira.  Morillo Decl. ¶ 17.  That same day, the Mexican Financial Intelligence Unit ("UIF") – which is part of the Mexican Finance Ministry and responsible for detecting and preventing financial crimes as well as enforcing financial crime regulations – froze accounts held by both AHMSA and Mr. Ancira at Mexican banks.  Morillo Decl. ¶ 17.  The following day, May 28, 2019, the Mexican authorities requested the issuance of an Interpol "Red Notice" against Mr. Ancira.  Morillo Decl. ¶ 18.

On May 28, 2019, Mr. Ancira was arrested in Mallorca.  After being detained for approximately one month, Mr. Ancira was released on bail.  For over a year, he has been unable to travel outside of Spain and is required to self-report to the Spanish authorities every two days.  Morillo Decl. ¶ 19.

2.      **Mexican Authorities' Failure to Afford Mr. Ancira Due Process in Issuing the Arrest Warrant**

Prior to the issuance of the Arrest Warrant and Interpol Red Notice, the Mexican criminal authorities never summoned Mr. Ancira to appear in court in México to face the charges.  Morillo Decl. ¶ 23.  That Mexican criminal authorities did neither violates Mexican law.  On August 14, 2020, the Mexican Supreme Court (Suprema Corte de Justicia de la Nación) issued a "*jurisprudencia*" (which sets forth legal guidance binding on lower courts) concerning the issuance

8

of arrest warrants ("Jurisprudencia").  The Jurisprudencia became effective for all courts as of August 17, 2020 and applies to matters that were initiated prior to that date, including that against Mr. Ancira.  Morillo Decl. ¶ 24.

As set forth in the Jurisprudencia, the Mexican Supreme Court states that prosecutors seeking an arrest warrant must either (1) request that the criminal court summon the defendant to an initial hearing in good faith before ordering his or her arrest; or (2) prove to the criminal court why there is a need for confidentiality (e.g., the defendant is a flight risk) and the first factor cannot thus be satisfied.  Only after the prosecutors prove the need for confidentiality can a Mexican court issue an arrest warrant on an *ex parte* basis.  Absent satisfaction of either of these conditions, the Mexican Supreme Court held that the issuance (much less execution) of an arrest warrant against a defendant violates that defendant's rights under the Mexican constitution.  Morillo Decl. ¶ 24.

### 3.   Mexican Federal Court Decision Declaring That the Criminal Complaint Against Mr. Ancira Was Time-Barred

In February 2020, Mr. Ancira filed a writ of *amparo* with the federal court in Chiapas, México ("Chiapas Amparo").  Declaration of Gustavo Adolfo Madero Ucero, ¶ 24 ("Mexican Counsel Decl.").  An *amparo* is a type of legal recourse that individuals and entities (such as companies) in México, Spain and other primarily Spanish-speaking countries can use in order to challenge actions of the state (e.g., an arrest warrant, seizure of a party's assets) that may violate fundamental human rights (e.g., freedom of religion), due process and constitutional rights. Morillo Decl. ¶ 25; Mexican Counsel Decl. ¶ 22; Declaration of Javier Sánchez-Vera Gómez-Trelles and Manuel Ollé Sesé, ¶ 15 ("Spanish Counsel Decl.").

In the Chiapas Amparo, Mr. Ancira argued that the Secretaría de Hacienda y Crédito Público, or Ministry of Treasury, had failed to file a criminal complaint for money laundering against him within the three-year statute of limitations period prescribed by article 107 of the

Mexican Federal Criminal Code.  Mexican Counsel Decl. ¶ 24; *see also* Morillo Decl. ¶ 25.  In México, the filing of a criminal complaint – which sets forth allegations of potential criminal offenses (such as money laundering) and is typically filed by the victim of the offense – initiates a criminal investigation by the Mexican law enforcement authorities.  Mexican Counsel Decl. ¶ 9.

On August 13, 2020, the court in Chiapas held that the criminal complaint against Mr. Ancira, which had been filed in May 2019, was time barred because the Ministry of Treasury (which, by law, is the "victim" of money laundering offenses and thus is the only party with legal standing to file such complaints) had failed to file it within the three-year statute of limitations period ("Chiapas Amparo Decision").  Mexican Counsel Decl. ¶ 25; Morillo Decl. ¶ 26.

Given the lapse of the statute of limitations, the Chiapas court concluded that the criminal court in Mexico City – which is the court that issued the Arrest Warrant – had to immediately cancel the Arrest Warrant and informed the Mexico City court of its decision.  Mexican Counsel Decl. ¶ 25.  The Mexico City criminal court did not do so because of a pending decision in a separate *amparo* proceeding that Mr. Ancira had filed with the court dedicated to criminal *amparo* cases in Mexico City challenging the FGR's issuance of the Arrest Warrant ("Mexico City Amparo").  This court denied the Mexico City Amparo in late November 2019, a decision that Mr. Ancira appealed in December 2019.  Mexican Counsel Decl. ¶ 23.  As a decision from the court hearing the appeal of the Mexico City Amparo remains outstanding, Mr. Ancira (through his representatives) asked the Chiapas court for clarification regarding the Chiapas Amparo Decision (e.g., on its applicability).  The Chiapas court thereafter issued an order directing the cancellation of the Arrest Warrant ("Cancellation Order").  The Chiapas court wrote that its order had to be enforceable with immediate effect because the case involved Mr. Ancira's personal liberty.  Mexican Counsel Decl. ¶ 25.

Shortly after the court issued the Chiapas Amparo Decision, prosecutors from the FGR filed an appeal challenging it. Federal prosecutors also requested that the Chiapas court stay enforcement of the Cancellation Order and the Chiapas Amparo proceeding in general, on the basis that enforcement of the Cancellation Order may cause irreparable harm to the FGR. On August 20, 2020, the Chiapas court granted the stay. Mexican Counsel Decl. ¶ 26.

On the same day, August 20, 2020, the Consejo de la Judicatura Federal ("CJF"), or Federal Judicial Council (which is responsible for, among other things, disciplinary actions against judges), suspended the judge who issued the Chiapas Amparo Decision for six months. The CJF made such determination on the rationale that the Chiapas judge issued an order finding that the statute of limitations had lapsed despite knowledge that another court had denied the Mexico City Amparo (in which Mr. Ancira challenged the validity of the Arrest Warrant) in November 2019. Mexican Counsel Decl. ¶ 27. During his daily press conference on August 20, 2020, Mr. López Obrador (who is publicly targeting his political rivals and their supporters, including Mr. Ancira) predictably dismissed the import of the Chiapas Amparo Decision. *See* Excerpt of August 20, 2020 Press Conference (Morillo Decl. ¶ 27, Ex. 3).

### 4. Status of the Mexican Criminal Proceeding

Given the aforementioned procedural developments – which are highly unusual in *amparo* proceedings in México – as of the date of this Application, the Mexican Criminal Proceeding against Mr. Ancira remains ongoing and the Arrest Warrant remains in effect. In particular and as described below, the Mexican Criminal Proceeding against Mr. Ancira is in the initial investigation stage. Mexican Counsel Decl. ¶¶ 20, 28.

México's criminal justice system entails three basic stages (excluding appeals or *amparo* proceedings), as follows: (1) the investigation stage, which commences with the filing of the criminal complaint and comprises (i) an initial investigation, typically conducted by prosecutors

with the assistance of the police (either at the state or federal level) and that culminates in an initial hearing similar to an arraignment where the prosecutors explain the evidence in their possession and their preliminary legal theory of the case to the court and the defendant; and (ii) if the court determines there is sufficient evidence for prosecutors to bring a case to trial, a formal investigation, which is conducted by the same prosecutors who did the initial investigation but may encompass additional evidence-gathering to prepare for trial and is overseen by the court (e.g., the court sets a deadline for completion of the further investigation);  (2) the intermediate stage, which commences with prosecutors filing what is called an "*accusation*" (which is akin to an indictment and sets forth the criminal charges) and encompasses all pre-trial motions and discovery; and (3) the trial.  Mexican Counsel Decl. ¶¶ 7-13.

The proceeding against Mr. Ancira is necessarily at the investigation stage because the initial hearing – during which prosecutors present the evidence in their possession and legal theory of the case to a defendant and the court – has not yet taken place.  Mexican Counsel Decl. ¶ 20. During this (and any stage described above), Mr. Ancira can present evidence to the federal prosecutors (which then becomes part of the prosecutors' investigative file) or to the court. Mexican Counsel Decl. ¶ 14.  Under the Mexican criminal system, prosecutors are required to maintain a formal "file" containing all documents and information relating to the investigation, including evidence they have gathered.  Mexican Counsel Decl. ¶ 10.

### 5.   The Spanish Extradition Proceeding

On June 21, 2019, México issued the Extradition Request.  Notably, México did not attach copies of the prosecutors' investigative file (described above), the court's docket relating to the case or any evidence used by México to support the Arrest Warrant or the Extradition Request. Morillo Decl. ¶ 21; Mexican Counsel Decl. ¶ 19; Spanish Counsel Decl. ¶ 7.

On May 27, 2020 – nearly a year after his arrest – the First Section of the Criminal Chamber of the National Court of Spain ("First Court") granted the Extradition Request.  On July 15, 2020, Mr. Ancira appealed the order granting the Extradition Request to the Plenary of the Criminal Chamber of the National Court of Spain ("Plenary Court").  Spanish Counsel Decl. ¶¶ 12-13; Morillo Decl. ¶ 22.

As of the date of this filing, a decision from the Plenary Court remains pending but is expected in September or October 2020, at the earliest.  Spanish Counsel Decl. ¶ 13.  To the extent that Mr. Ancira identifies evidence that may assist his defense in the appeal, he would be permitted to present it.  Indeed, Article 24 of the Spanish Constitution, which provides for the fundamental right to present a defense in a criminal matter, expressly allows for the introduction of new evidence in the Plenary Court.  Spanish Counsel Decl. ¶ 24.

If Mr. Ancira loses this appeal and the Plenary Court affirms the First Court's granting of the Extradition Request, he plans to appeal the decision to the Spanish Constitutional Tribunal, the highest court in Spain, as well as file an *amparo* further challenging the decision to extradite him to México.  Spanish Counsel Decl. ¶ 15.

## III.    REQUESTED DISCOVERY

Faced with criminal charges in México that he participated in transactions that comprised money laundering, Mr. Ancira is now seeking to marshal evidence showing the lack of impropriety for these transactions.  Through the proposed subpoena to UBS,[6] Mr. Ancira seeks documents and information in UBS's possession, custody and/or control relating to an account held by Tochos Holding (the UBS Account) with IBAN CH610024024088097460T from March 1, 2012 through August 31, 2013 ("Relevant Period").

---

[6]    *See* **Exhibit A** (appended hereto).

Mr. Ancira seeks information during the Relevant Period because it encompasses the time from at or around when AHMSA and Mr. Lozoya (through Wolfsburg) executed the March 2012 Contract through the last publicly reported transfer from the UBS Account to a third party within potential scope of the AHMSA Investigation.  In particular and according to one media report, the UBS Account sent one payment to a third party on or around August 5, 2013,[7] meaning that it was open until at least that month.

First, Mr. Ancira requests information (e.g., sender, recipient, amount, date, counterparty bank, correspondent bank) for all transactions (e.g., inflows, outflows) for the UBS Account during the Relevant Period, irrespective of currency ("Transactional Data").

Second, Mr. Ancira requests information regarding the following transactions that are currently known to be under investigation as part of the Mexican Criminal Proceeding and, in turn, the Spanish Extradition Proceeding:  (1) the transfers from AHMSA to the UBS Account that were made pursuant to the March 2012 and October 2012 Contracts; and (2) the transfers from the UBS Account to Ms. Cardenas purportedly made in connection with Mr. Lozoya's purchase of real estate in Mexico City ("Subject Transactions").  **Figure 1** lists the Subject Transactions, which, upon information and belief, are all denominated in U.S. dollars ("USD") and thus likely to have been cleared by UBS's Stamford branch.[8]

---

[7]     *See* Raúl Olmos, "Adquieren propiedad con un fideicomiso," REFORMA (Aug. 5, 2013) (referring to an August 5, 2013 transfer of USD 1.2 million from Tochos Holding to an account at the Bank of Montreal), https://www.reforma.com/adquieren-propiedad-con-un-fideicomiso/ar1696018?v=6.

[8]     *See, e.g.*, UBS, "Correspondent Banks List" (last updated August 2020) (hereinafter, "UBS Correspondent Banks List") (listing "UBS AG, Stamford Branch (UBS is self clearer)" as the correspondent bank for U.S. dollars), https://www.ubs.com/global/en/bank_for_banks/offering/cash_currency/_jcr_content/par/table.0896104915.file/dGF ibGVUZXh0PS9jb250ZW50L2RhbS91YnMvZ2xvYmFsL2JhbmtfZm9yX2JhbmtzL2JhbmtfZm9yX2JhbmFsX2N1c3Rv ZHkvY290LWNicC5wZGY=/cot-cbl.pdf.

14

| Figure 1.  Subject Transactions[9] | | | |
|---|---|---|---|
| **Date (Approximate)** | **Sender** | **Recipient** | **Amount (USD)** |
| June 12, 2012 | AHMSA | Tochos Holding | 500,000 |
| November 1, 2012 | AHMSA | Tochos Holding | 1,000,000 |
| November 7, 2012 | Tochos Holding | Intercam Casa de Bolsa SA de CV / Maria del Carmen Ampudia Cardenas (No. 36888689) | 1,500,000 |
| November 9, 2012 | AHMSA | Tochos Holding | 1,000,000 |
| November 13, 2012 | Tochos Holding | Intercam Casa de Bolsa SA de CV / Maria del Carmen Ampudia Cardenas (No. 36888689) | 1,080,000 |
| November 16, 2012 | AHMSA | Tochos Holding | 100,000 |
| November 28, 2012 | AHMSA | Tochos Holding | 800,000 |

For each of the Subject Transactions, Mr. Ancira requests (in addition to Transactional Data) the following:  (1) email correspondence and any other documents (e.g., contracts, Know-Your-Customer ("KYC") information) exchanged between (i) UBS personnel and representatives of the UBS Account, including but not limited to the accountholder(s), beneficial owner(s), authorized signator(ies) and power(s) of attorney ("UBS Account Representatives"); and (ii) UBS personnel, including but not limited to discussions concerning the purpose, origin (in the case of inflows) or destination (in the case of outflows) of the Subject Transaction; (2) documents relating to due diligence investigations that UBS might have performed to seek to substantiate the basis for the Subject Transaction, as required under applicable AML statutes, including email

---

[9]      *See* Arrest Warrant at 12-13; Extradition Request at 9-10.

correspondence between UBS personnel and UBS Account Representatives and among UBS personnel, as well as any KYC documents maintained in UBS's customer management systems that establish the rationale for the Subject Transaction (e.g., a deposit related to a contract for services that the client provided UBS at account opening and that is maintained in the client's KYC file); (3) copies of any anti-money laundering ("AML") alerts that UBS's transaction monitoring system may have triggered for each Subject Transaction and any correspondence with, or other documents (e.g., invoices) provided by, UBS Account Representatives; and (4) copies of, and any documents and information concerning, any Suspicious Activity Reports ("SAR[s]") filed in connection with the Subject Transaction anywhere in the world, including in the United States or Switzerland ("Subject Transaction Information").

Mr. Ancira requests the Subject Transaction Information for sub-categories (1) and (3) from the Relevant Period and for sub-categories (2) and (4) from March 1, 2012 through the present. As to the latter two sub-categories, Mr. Ancira seeks information and documents through the present because he understands that UBS may have conducted due diligence investigations and/or filed SARs regarding the Subject Transactions well after August 2013 or even account closing (e.g., after the media began reporting on the AHMSA Investigation in 2018).

Mr. Ancira intends to use the Transactional Data and Subject Transaction Information (together, "Requested Discovery") to aid in his defense of the Mexican Criminal Proceeding and to bolster his efforts to fight the Spanish Extradition Proceeding. Among other things, Mr. Ancira believes, upon information and belief, that the Requested Discovery will support his arguments that the transfers pursuant to the March and October 2012 Contracts were legitimate and the money laundering allegations baseless.

IV.    **ARGUMENT**

   A.    **Legal Framework**

Mr. Ancira respectfully submits that this Court should grant the Application because (1) it

meets the statutory requirements set forth in Section 1782 (i.e., the entity from which discovery is

sought resides in the district to which the application is made, the request seeks information and

the production of documents, the discovery is for use in proceedings before foreign tribunals, and

the applicant is an interested person in such proceedings); and (2) weighing the discretionary *Intel*

factors (e.g., whether (i) the target of discovery is a participant in the foreign proceedings; (ii) the

foreign tribunals are receptive to the use of the Requested Discovery; (iii) the request is an attempt

to circumvent foreign law; and (iv) the request is unduly burdensome) compels such result.[10]

Section 1782 permits district courts to grant discovery for use in a pending or "reasonabl[y]

contemplat[ed]" foreign proceeding.  *Intel*, 542 U.S. at 259.  The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him
> to give his testimony or statement or to produce a document or other thing for use
> in a proceeding in a foreign or international tribunal, including criminal
> investigations conducted before formal accusation.  The order may be made . . .
> upon the application of any interested person . . . .

28 U.S.C. § 1782(a).

An application made pursuant to Section 1782 must satisfy three statutory requirements:

"(1) the person from whom discovery is sought resides (or is found) in the district of the district

court to which the application is made, (2) the discovery is for use in a foreign proceeding before

a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any

---

[10]    Moreover, the Court only needs to find that the Application meets the statutory requirements with regard to, and that the discretionary *Intel* factors favor, one of the foreign proceedings.  *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 134-35 (2d Cir. 2017) (upholding Section 1782 discovery order in which the district court analyzed only one foreign proceeding but permitted use of discovery obtained in additional foreign proceedings that had not been analyzed).  "Where a district court authorizes Section 1782 discovery for use in one foreign proceeding, it need not analyze every foreign proceeding in which the petitioner is involved under the Section 1782 and *Intel* framework." *In re Sampedro*, No. 3:18-MC-47, 2018 WL 5630586, at *2 (D. Conn. Oct. 30, 2018) (citing *Accent Delight*).

interested person." *Brandi-Dohrn* v. *IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

After determining that the three statutory requirements are satisfied, courts must then consider four discretionary factors in deciding whether to grant a Section 1782 application: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel*, 542 U.S. at 264-65.

Moreover, courts in the Second Circuit "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A.* v. *R. Esmerian, Inc.*, 51 F.3d 1095, 1097 (2d Cir. 1995) (citation omitted); *see also In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997) (reversing trial court's denial of Section 1782 application for "failing to take into consideration the twin aims of the statute in reaching its decision").

The Supreme Court and Second Circuit have both acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 (citation omitted) ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("Congress has expressed as its aim that the statute be interpreted broadly").

Case 3:20-mc-00071-TOF   Document 1-1   Filed 09/03/20   Page 24 of 49

**B.     The Applications Meet the Statutory Requirements of Section 1782**

The Application satisfies the three statutory requirements of Section 1782: (1) UBS "resides" or is "found" in the District of Connecticut; (2) the Requested Discovery is "for use" in foreign legal proceedings; and (3) Mr. Ancira is an "interested person" in the foreign legal proceedings.

### 1.     UBS "Resides" or Is "Found" in the District of Connecticut

UBS maintains a place of business in the District of Connecticut – specifically, a branch located at 677 Washington Boulevard, Stamford, CT 06912 ("Stamford Branch").[11]  The Stamford Branch, among other things, functions as UBS's U.S. correspondent bank.[12]  Upon information and belief, the Stamford Branch thus processes or "clears" U.S. dollar transactions for UBS's non-U.S. operations, including those in Switzerland.

The Second Circuit has held that an entity "resides or is found in" a district if a court can exercise personal jurisdiction over it.  *See In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) ("resides or is found in" standard "extends to the limits of personal jurisdiction consistent with due process"); *see also In re Edelman*, 295 F.3d at 178 (noting that "§ 1782(a) supports a flexible reading of the phrase 'resides or is found'").  Furthermore, "there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'"  *In re del Valle Ruiz*, 939 F.3d at 529 (quoting *Bristol-Myers Squibb Co.* v. *Superior Ct. of Cal.*, __ U.S. __, 137 S. Ct. 1773, 1780, 198 L.Ed.2d 395 (2017) (alteration in original) (quoting *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011)).  Specifically, the Requested Discovery must proximately

---

[11]     *See* UBS, "Locations," https://www.ubs.com/locations.html#stamford/en/ps/all/_en_us_stamford_600-washington-blvd/41.0477/-73.5441/; *see also* Sec. Exch. Comm., UBS AG Form 20-F 2020, https://www.sec.gov/Archives/edgar/data/1114446/000161052020000041/arubsen.htm.

[12]     *See, e.g.*, UBS Correspondent Banks List.

19

result from UBS's contacts with this forum – "[t]hat is, [UBS] having purposefully availed itself of the forum must be the primary or proximate reason that the evidence sought is available at all." *Id.* at 530; *see also Pfaff* v. *Deutsche Bank AG*, No. 20 Misc. 25, 2020 WL 3994824, at *8-9 (S.D.N.Y. July 15, 2020) (finding specific jurisdiction over Deutsche Bank because its silver trading activities took place on an exchange within the Southern District of New York).

Here, this Court has personal jurisdiction over UBS because it is located in and transacts business in the District of Connecticut through the Stamford Branch. In addition, because the Stamford Branch functions as UBS's U.S. correspondent bank – meaning it clears transfers into and out of accounts maintained at non-U.S. UBS locations, such as in Geneva, that are denominated in U.S. dollars – the Requested Discovery regarding the UBS Account and Subject Transactions proximately results from UBS's contacts in the District of Connecticut. As such, the first statutory requirement is satisfied.

### 2.      The Requested Discovery Is "For Use" in a Foreign Proceeding

Under the second statutory requirement, an applicant must demonstrate that the Requested Discovery is "for use" in a proceeding before a foreign tribunal. *See Brandi-Dohrn*, 673 F.3d at 80. As discussed further below (1) the Mexican Criminal Proceeding and Spanish Extradition Proceeding each constitute a "foreign proceeding" under Section 1782;[13] and (2) the Requested Discovery is "for use" in both proceedings.

#### (a)      The Mexican Criminal Proceeding Is a Foreign Proceeding

The Mexican Criminal Proceeding qualifies as a pending proceeding in a "foreign or international tribunal" for purposes of Section 1782, which explicitly contemplates the inclusion of "criminal investigations conducted before formal accusation" within its scope. 28 U.S.C. §

---

[13]      As the *Intel* Court made clear, to fall within the ambit of Section 1782, a "foreign proceeding" must be pending or "within reasonable contemplation." 542 U.S. at 259.

1782(a); *see also Weber* v. *Finker*, 554 F.3d 1379, 1384 (11th Cir. 2009) ("Congress clearly intended for § 1782 to facilitate discovery by individuals for use in foreign criminal actions."). There is currently an active criminal investigation in México against Mr. Ancira.  Mexican Counsel Decl. ¶ 20; *see also supra* Section II.C.

U.S. courts routinely grant Section 1782 applications to obtain discovery for use in foreign criminal proceedings and investigations.  *See, e.g.*, *In re Berlamont*, 773 F.3d 456, 461-62 (2d Cir. 2014) (holding that Section 1782 permitted district court to order the production of discovery for use in a foreign criminal investigation being conducted by an investigating magistrate); *Weber* v. *Finker*, 554 F.3d at 1384-85 (affirming order granting Section 1782 application filed by defendant in Swiss criminal action).

### (b)    The Spanish Extradition Proceeding Is a Foreign Proceeding

The Spanish Extradition Proceeding also qualifies as a proceeding in a "foreign or international tribunal" for purposes of Section 1782 for two independent reasons.  <u>First</u>, the Spanish Extradition Proceeding squarely relates to, and is effectively an extension of, a pending criminal investigation: the Mexican Criminal Proceeding.  Indeed, the Arrest Warrant and, in turn, the Extradition Request are based upon the charges underlying the Mexican Criminal Proceeding. Mexican Counsel Decl. ¶¶ 15-20; Spanish Counsel Decl. ¶¶ 2, 7; Morillo Decl. ¶¶ 14-23; *see also* Section II.C.  As with the Mexican Criminal Proceeding, the Spanish Extradition Proceeding therefore constitutes a "foreign proceeding" under Section 1782.  <u>Second</u>, an appeal of a non-U.S. court order irrespective of the underlying nature of the proceeding (such as Mr. Ancira's pending appeal of the decision of the First Court) constitutes a foreign proceeding and in support of which U.S. courts have granted Section 1782 applications.  *See, e.g.*, *IPCom GMBH & Co. KG* v. *Apple Inc.*, 61 F. Supp. 3d 919, 923 (N.D. Cal. 2014) (denying motion to quash subpoena served pursuant

21

to Section 1782, finding that, although trial in the foreign proceeding had concluded, case remained pending before an appellate court).

**(c)      A Potential *Amparo* Proceeding in Spain Is a Foreign Proceeding**

Alternatively, if Mr. Ancira loses his appeal in the Plenary Court, he intends to file an *amparo* in Spain further challenging the decision to extradite him to México ("Spanish Amparo Proceeding").  Spanish Counsel Decl. ¶¶ 15-17.  This also constitutes a foreign proceeding.

As the *Intel* Court held, although a proceeding for which discovery is sought under Section 1782 must be "within reasonable contemplation," it need not be "pending" or "imminent."  542 U.S. at 259.  Instead, a Section 1782 applicant only needs to be able to demonstrate "some objective indicium that the action is being contemplated" (i.e., something "from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye").  *Certain Funds, Accounts and/or Inv. Vehicles* v. *KPMG, L.L.P.*, 798 F.3d 113, 124 (2d Cir. 2015).  Courts in this Circuit routinely grant Section 1782 applications in support of contemplated litigation.  *See, e.g.*, *In re Hornbeam Corp.*, 722 F. App'x 7, 9-10 (2d Cir. 2018) (holding that a foreign proceeding was reasonably contemplated when the applicant "represented that it intended to initiate further litigation," and "articulated a theory on which it intended to litigate").

Here, Mr. Ancira has retained Spanish counsel and intends to file an *amparo*, if necessary, to contest further his extradition to México.  As such, the Spanish Amparo Proceeding qualifies as a reasonably contemplated "foreign proceeding" under Section 1782 for which Mr. Ancira can seek judicial assistance in the United States.  *See, e.g.*, *In re IJK Palm LLC*, No. 3:16-MC-171, 2019 WL 2191171, at *4, 6 (D. Conn. Jan. 30, 2019) (finding contemplated lawsuits in the Cayman Islands, where the petitioner had hired attorneys, investigated parties, and reviewed its own files, constituted  reasonably contemplated foreign proceedings).

22

(d)     The Requested Discovery Is "For Use" in a Foreign Proceeding

The Requested Discovery is for "use" in both the pending Mexican Criminal Proceeding and Spanish Extradition Proceeding as well as in the potential Spanish Amparo Proceeding. Notably, an applicant is not required to show that the information sought would be discoverable or admissible in the foreign proceeding. *See Brandi-Dohrn*, 673 F.3d at 82 ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application.") (emphasis in original). Rather, an applicant only needs to show that it has "the *practical ability* . . . to place a beneficial document – or the information it contains – before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017) (emphasis in original). Further, an applicant need not demonstrate that it can only prevail in a foreign proceeding if it obtains the sought-after discovery. *See Mees* v. *Buiter*, 793 F.3d 291, 298 (2d Cir. 2015). Instead, an applicant only needs to show that the sought-after discovery "will be employed with some advantage or serve some use in the proceeding." *Id.*

As discussed above, the Requested Discovery will be used to support Mr. Ancira's defenses in the Mexican Criminal Proceeding and Spanish Extradition Proceeding, and would also be used in the potential Spanish Amparo Proceeding (i.e., should the Plenary Court affirm the First Court's decision to grant the Extradition Request). Mexican Counsel Decl. ¶¶ 4, 29-30; Spanish Counsel Decl. ¶¶ 4, 19-20. Mr. Ancira will use the Requested Discovery in the Mexican Criminal Proceeding to (1) demonstrate, among other things, that the transfers to Tochos Holding were pursuant to consulting agreements; and (2) argue that the charges against him for money laundering must therefore be dropped. Mexican Counsel Decl. ¶ 29. Mr. Ancira will similarly use the Requested Discovery in the Spanish Extradition Proceeding (and Spanish Amparo Proceeding, to the extent filed) to demonstrate that the Mexican criminal charges pending against

him are baseless and that extradition is therefore unwarranted and improper. Spanish Counsel Decl. ¶ 19.

### 3. Mr. Ancira Is An "Interested Person" in the Foreign Proceedings

Finally, Section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceeding. While Section 1782 broadly covers those with the right to participate and submit evidence in a foreign proceeding, there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256.

Here, Mr. Ancira is (1) a party (i.e., the defendant) in the Mexican Criminal Proceeding; (2) a party (i.e., the appellant) in the Spanish Extradition Proceeding; and (3) a party in the potential Spanish Amparo Proceeding (i.e., the petitioner). Mexican Counsel Decl. ¶ 2; Spanish Counsel Decl. ¶¶ 2, 15. Mr. Ancira is, therefore, an "interested person" under Section 1782. *See Intel*, 542 U.S. at 256; *see also Medeiros* v. *Int'l Game Tech.*, No. 2:16-CV-00877, 2016 WL 1611591, at *2 (D. Nev. Apr. 22, 2016) (finding Section 1782 petitioner to be an "interested person" in proceedings in Brazil in which he was a criminal defendant).

### C. The *Intel* Discretionary Factors Weigh in Favor of Granting the Application

Once the statutory requirements under Section 1782 are met, the Court should consider the four discretionary *Intel* factors. 542 U.S. at 264-65. Each of these factors weighs in favor of granting the discovery requested herein.

First, UBS is not a party to the Foreign Proceedings. Second, there is no reason to believe that the Spanish and Mexican courts would be unreceptive to evidence obtained through Section 1782 discovery. Third, Mr. Ancira is acting in good faith and is not seeking to avoid any foreign restriction on gathering evidence. Fourth, the Requested Discovery is carefully circumscribed and targeted to key facts so as to avoid undue burden on UBS.

### 1.    The First *Intel* Factor Favors Granting Discovery

The first *Intel* factor asks whether the documents or testimony sought are within a foreign

tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid.  *Intel*, 542 U.S. at 264.

As the *Intel* Court explained, "when the person from whom discovery is sought is a participant in

the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily

is when evidence is sought from a nonparticipant in the matter arising abroad." *Id.*

Here, UBS is not a party to the Mexican Criminal Proceeding or Spanish Extradition

Proceeding (and would not be a party in a potential Spanish Amparo Proceeding) and is therefore

beyond the jurisdiction of the respective Mexican and Spanish courts overseeing each proceeding.

Mexican Counsel Decl. ¶ 32; Spanish Counsel Decl. ¶ 22.  As such, this factor weighs in favor of

granting the Application.

### 2.    The Second *Intel* Factor Favors Granting Discovery

The second *Intel* factor asks the Court to examine "the nature of the foreign tribunal, the

character of the proceedings underway abroad, and the receptivity of the foreign government or

the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264.

The Second Circuit has held that there is a strong presumption that a foreign tribunal will

be receptive to evidence obtained in the United States.  *See Euromepa, S.A.* v. *R. Esmerian, Inc.*,

51 F.3d 1095, 1102 (2d Cir. 1995) ("Absent specific directions to the contrary from a foreign

forum, the statute's underlying policy should generally prompt district courts to provide some form

of discovery assistance.").  As a result, a court should deny discovery on the basis of lack of

receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would

reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added).

Here, there is no evidence that the courts overseeing the proceedings in México and Spain

would be hostile to any evidence gathered through the Application.  To the contrary, the Mexican

and Spanish courts are each receptive to discovery obtained via Section 1782 and there is no indication that either would reject evidence collected pursuant to Section 1782.  Mexican Counsel Decl. ¶¶ 40-41; Spanish Counsel Decl. ¶ 28.

First, in México, a criminal defendant has a fundamental right to offer evidence during a criminal proceeding and thus Mexican courts are receptive to evidence obtained through a Section 1782 request.  Mexican Counsel Decl. ¶¶ 34-41.  This comports with the findings of numerous U.S. courts, which have found that, at the very least, there is no indication that Mexican courts would be unreceptive to discovery gathered abroad.  *See, e.g.*, *In re Grupo México SAB de CV*, No. 3:14-MC-00073, 2014 WL 12691097, at *3 (N.D. Tex. Oct. 17, 2014) (finding that "there is no evidence to suggest that the Mexican court is hostile to U.S. federal courts' assistance under § 1782(a)"); *see In re Samsung Elecs., S.A. de C.V.*, No. 06-20639-CIV, 2006 WL 8433576, at *2 (S.D. Fla. Apr. 12, 2006) (in denying motion to quash subpoena served pursuant to Section 1782, noting that, among other things, "neither party argues that Mexican tribunals, or the Mexican government, are generally unreceptive to assistance from U.S. courts"); *In re Grupo Qumma*, No. M 8-85, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005) (finding no authoritative evidence that a Mexican court would reject additional evidence gathered through Section 1782 discovery); *see also In re Application of Operacion y Supervision de Hoteles, S.A. de C.V.*, No. 14 Misc. 82, 2015 WL 82007, at *6 (S.D.N.Y. Jan. 6, 2015) (denying motion to quash subpoena issued under Section 1782 related to letters rogatory from a Mexican court posing questions for one of its cases); *In re Request for Int'l Judicial Assistance from the Sixteenth Family Court of the Supreme Court of Justice of the Fed. Dist.*, No. 14-MC-80083, 2013 WL 1202545, at *1, 2 (N.D. Cal. Mar. 19, 2014) (granting Section 1782 application that involved letters rogatory from a Mexican court requesting relevant documents for one of its cases).

*Second*, in Spain, the Plenary Court (the court where Mr. Ancira's appeal is pending) and Constitutional Tribunal (the highest court in Spain and in which an *amparo* would be filed) are both receptive to new evidence obtained through a Section 1782 request and there is no indication that they would reject it.  Indeed, Article 24 of the Spanish Constitution, which provides for the fundamental right to present a defense in a criminal matter, allows for the introduction of new evidence in the Plenary Court.  Spanish Counsel Decl. ¶¶ 23-28.

This comports with the findings of numerous courts in this Circuit, which have found that, at the very least, there is no indication that Spanish courts would be unreceptive to discovery gathered abroad.  *See, e.g.*, *In re Sampedro*, No. 3:18-MC-47, 2018 WL 5630586, at *4 (D. Conn. Oct. 30, 2018) ("In the absence of any evidence from the Respondents of a Spanish declaration that specifically addresses and rejects the use of discovery gathered abroad, and in light of the policy goals of Section 1782, this factor weighs in favor of granting at least some of Petitioner's subpoenaed discovery."); *In re Mangouras*, No. 17-MC-172, 2017 WL 4990655, at *7 (S.D.N.Y. Oct. 30, 2017) ("The Court is not aware of any authoritative statement indicating that . . . the Spanish courts . . . would be unreceptive to information obtained through the assistance of United States courts."); *see also In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998) (vacating order denying Section 1782 discovery that had been sought for use in Spain because "the evidence presented to the district court strongly suggested receptivity by the Spanish court to the evidence sought by [Section 1782 applicant] rather than offense").

As such, this factor weighs in favor of granting the Application.

### 3.    The Third *Intel* Factor Favors Granting Discovery

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  The *Intel* Court expressly rejected the notion that Section 1782

requires that the evidence sought must be discoverable in the foreign proceeding itself. *Id.* at 260 (holding that Section 1782 does not impose a "foreign discoverability" requirement that evidence sought be discoverable under law governing foreign proceedings).[14]

The Second Circuit has also held that the specific documents or testimony discovered need not be admissible abroad. *See Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the *discoverability* of evidence in the foreign proceeding, we see no reason why it should not extend to the *admissibility* of evidence in the foreign proceeding. As in *Intel*, there is no statutory basis for any admissibility requirement.") (emphasis in original). The Second Circuit has further made clear that there is no requirement that an applicant must first exhaust its discovery remedies in a foreign court before seeking Section 1782 aid. *See In re Metallgesellschaft AG*, 121 F.3d at 79 ("[A] 'quasi-exhaustion requirement,' finds no support in the plain language of the statute and runs counter to its express purposes.") (internal citation omitted).

Here, Mr. Ancira is acting in good faith and the Application does not "attempt to circumvent" proof-gathering restrictions of Mexican or Spanish courts. Mexican Counsel Decl. ¶¶ 31, 33; Spanish Counsel Decl. ¶¶ 21, 23.

Mexican courts do not prohibit the use of evidence gathered abroad. Indeed, Mexican courts provide for the submission of evidence, regardless of whether it was obtained from within the jurisdiction of the tribunal. Mexican Counsel Decl. ¶ 41. Similarly, Spanish courts do not prohibit the use of evidence gathered abroad. Indeed, Spanish courts provide for the submission of evidence, regardless of whether it was obtained from within the jurisdiction of the tribunal. Spanish Counsel Decl. ¶ 28.

---

[14]     The *Intel* Court also cautioned that, although "[a] foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions[,] [such] reasons . . . do not necessarily signal objection to aid from United States federal courts." *Id.* at 261.

As such, this factor weighs in favor of granting the Application.

### 4.      The Fourth *Intel* Factor Favors Granting Discovery

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265.  The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure.  *See In re Bayer AG*, 146 F.3d at 195 ("The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute."); *see also In re Edelman*, 295 F.3d at 178 (applying the Federal Rules of Civil Procedure to Section 1782 discovery requests).

Here, the Requested Discovery is (1) narrowly tailored (e.g., the subpoena references specific entities, individuals, and transactions about which Mr. Ancira seeks documents and information);[15] (2) temporally limited; (3) non-privileged; (4) easily procured as the documents and information at issue are maintained in UBS's regular course of business; and (5) bears directly on the transactions at issue in the Mexican Criminal Proceeding (e.g., the transfers from AHMSA to the UBS Account) and, in turn, the Spanish Extradition Proceeding and potential Spanish Amparo Proceeding.  In contrast, whatever burden UBS may incur by producing the Requested

---

[15]      In addition, during any meet and confer process, Mr. Ancira will provide UBS with search terms (e.g., party names) to further target and narrow the scope of the subpoena.

Discovery is both modest and proportionate given the circumstances.[16]  As such, this factor weighs in favor of granting the Application.

## V.      CONCLUSION

For the foregoing reasons, Mr. Ancira respectfully requests that the Court enter an Order pursuant to Section 1782, granting him leave to serve a subpoena on UBS for the Requested Discovery and any other further relief the Court deems appropriate.

---

[16]      To the extent that the Court finds that the discovery requests are overbroad, it need not deny the Application altogether; rather, it may exercise its authority under Federal Rule of Civil Procedure 26 to limit the requests, thereby reducing the burden on UBS.  *See In re Malev Hungarian Airlines*, 964 F.2d 97, 102 (2d Cir. 1992) ("On remand, we wish to note that the district court can utilize its powers under the Federal Rules of Civil Procedure to lessen significantly the burden of handling this discovery."); *see also* Fed. R. Civ. P. 26(b)(2)(C)(i); Fed. R. Civ. P. 26(c). In addition, once the subpoena is served upon UBS, if there are ways in which the discovery requests can be more finely focused to reduce any burdens while still providing Mr. Ancira with the documents and information he requires, Mr. Ancira will, in good faith, meet and confer with UBS to address any such burdens.  That said, however, there is no reason to believe that the Requested Discovery is, in any way, unduly burdensome.  Furthermore, Mr. Ancira is willing to enter into a protective order should the Requested Discovery be granted in order to protect third-party, confidential or sensitive information.

Dated:  September 3, 2020                 BY:

_/s/ Kevin M. Smith_
Kevin M. Smith (ct24774)
David Norman-Schiff (ct30082)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, Connecticut 06510
Telephone:  (203) 498-4400
ksmith@wiggin.com
dnorman-schiff@wiggin.com

Juan P. Morillo (_pro hac vice admission pending_)
Jeanhee Hong (_pro hac vice admission pending_)
Kristin T. Casey (_pro hac vice admission pending_)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005-3314
Telephone:  (202) 538-8000
juanmorillo@quinnemanuel.com
jeanheehong@quinnemanuel.com
kristincasey@quinnemanuel.com

Lucas Bento (_pro hac vice admission pending_)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
lucasbento@quinnemanuel.com

_Attorneys for Applicant Alonso Ancira Elizondo_

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Connecticut

IN RE:
EX PARTE APPLICATION OF ALONSO
ANCIRA ELIZONDO FOR AN ORDER
TO OBTAIN DISCOVERY FOR USE IN
FOREIGN PROCEEDINGS PURSUANT
TO 28 U.S.C. § 1782

|  |  |
|---|---|
| *Plaintiff* | ) |
| v. | ) |
|  | ) Civil Action No. |
|  | ) |
|  | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                   UBS AG

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A.

| Place: Wiggin and Dana LLP<br>One Century Tower, P.O. Box 1832<br>New Haven, CT 06508-1832 | Date and Time:<br><br>09/28/2020 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

|  |  |
|---|---|
| *CLERK OF COURT* |  |
|  | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  _____
Alonso Ancira Elizondo _____ , who issues or requests this subpoena, are:
Kevin M. Smith and David Norman-Schiff, Wiggin and Dana LLP, One Century Tower, PO Box 1832, New Haven, CT

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____              _____
                                         *Server's signature*

                                   _____
                                         *Printed name and title*

                                   _____
                                         *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**
**REQUESTS FOR PRODUCTION FROM UBS AG**

**DEFINITIONS**

Unless otherwise defined, all words and phrases used in these requests for production ("Requests") shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense.  As used herein, the words set forth below shall be defined as follows:

1.  The obligations and rules of construction set forth in Local Rule 26 are incorporated in this Request, including as to the term "concerning."

2.  "Agreement" is used in its broadest ordinary sense and shall mean any oral or written act or arrangement regarding a course of action, including but not limited to Contracts (as defined below).

3.  "Communication" has the same meaning as that set forth in Local Rule 26.

4.  "Contract" is used in its broadest ordinary sense and shall mean a legally binding Agreement between two or more persons.

5.  "Document" has the same meaning as that set forth in Local Rule 26.

6.  "Emilio Lozoya" shall mean Emilio Ricardo Lozoya Austin, the former beneficial owner of the UBS Account.

7.  "Gilda Lozoya" shall mean Gilda Susana Lozoya Austin, Emilio Lozoya's sister and beneficial owner of the UBS Account.

8.  "Invoice" is used in its broadest ordinary sense and shall mean a list of goods shipped or services provided and amounts owed for same.

9.  "Subject Transactions" shall mean (i) five transfers from Altos Hornos de México, S.A.B. de C.V. ("AHMSA") to the UBS Account; and (ii) two transfers from the UBS Account to Intercam Casa de Bolsa SA de CV / Maria del Carmen Ampudia Cardenas (No. 36888689).

**Figure 1** lists the Subject Transactions, which, upon information and belief, are all denominated in U.S. dollars ("USD") and thus likely to have been cleared by UBS's Stamford branch.

| Figure 1.  Subject Transactions | | | |
|---|---|---|---|
| **Date (Approximate)** | **Sender** | **Recipient** | **Amount (USD)** |
| June 12, 2012 | AHMSA | UBS Account | 500,000 |
| November 1, 2012 | AHMSA | UBS Account | 1,000,000 |
| November 7, 2012 | UBS Account | Intercam Casa de Bolsa SA de CV / Maria del Carmen Ampudia Cardenas (No. 36888689) | 1,500,000 |
| November 9, 2012 | AHMSA | UBS Account | 1,000,000 |
| November 13, 2012 | UBS Account | Intercam Casa de Bolsa SA de CV / Maria del Carmen Ampudia Cardenas (No. 36888689) | 1,080,000 |
| November 16, 2012 | AHMSA | UBS Account | 100,000 |
| November 28, 2012 | AHMSA | UBS Account | 800,000 |

10.     "Tochos Holding" shall mean: (i) Tochos Holding Limited, a British Virgin Islands ("BVI") company; (ii) any parents, subsidiaries, affiliates, segments, or divisions both presently existing and those that previously existed of Tochos Holding Limited; and/or (iii) any present or former officers, directors, employees, consultants, contractors, agents, members of the board of directors, or members of the board of trustees of Tochos Holding Limited.

11.     "Transaction(s)" shall mean all deposits, withdrawals, incoming wire transfers, outgoing wire transfers, charges, payments, purchases, returns, bank fees, checks, letters of credit,

and drafts typically made between a customer of a bank (including a foreign bank) and the bank itself.

12. "Transactional Data" shall include information regarding each transaction, including but not limited to sender, recipient, amount, date, counterparty bank and correspondent bank.

13. "UBS Account" shall mean the account at UBS for Tochos Holding with International Bank Account Number ("IBAN") CH610024024088097460T.

14. "UBS Account Representatives" shall include accountholder(s), beneficial owner(s), authorized signator(ies) and power(s) of attorney, or any other party (not employed by UBS) with authority to access information and documents concerning, and direct activity for, the UBS Account.

15. "You," "Your" and/or "UBS" shall mean UBS AG and any parents, subsidiaries, affiliates, branches, segments, or divisions both presently existing and those that previously existed, and any present or former officers, directors, employees, consultants, contractors, agents, members of the board of directors, or members of the board of trustees for UBS AG.

16. The terms "any" and "each" should be understood to include and encompass "all."

17. Where appropriate, the singular form of a word should be interpreted in the plural and vice versa, to acquire the broadest possible meeting.

3

## **INSTRUCTIONS**

1.   The obligations and rules of construction set forth in Rule 45 of the Federal Rules of Civil Procedure are incorporated in this Request.  A copy of Rule 45 sections (c), (d), (e) and (g) is attached to the subpoena.

2.   Unless otherwise stated in a specific Request, these Requests seek responsive information and Documents authored, generated, disseminated, drafted, produced, reproduced, or otherwise created or distributed from March 1, 2012 through August 31, 2013.

3.   With respect to the Documents produced, You shall produce them as they are kept in Your usual course of business, including, if applicable, in their native format. A draft of a Document is unique and separate from the final version of that Document. All drafts of each Document are to be produced, without abbreviation or redaction.

4.   Each Request seeks production of each Document in its entirety, without abbreviation or redaction, including, without limitation, all attachments, transmittal sheets, notes, cover letters, exhibits, enclosures, and all drafts and non-identical copies of each Document.

5.   Documents attached to each other shall not be separated and shall be produced together.

6.   A Document with handwritten, typewritten or other recorded notes, editing marks, etc., is a separate, unique Document and is not, and shall not be deemed to be, identical to one without such modifications, additions, or deletions.

7.   Each Request shall be construed independently, and no Request shall be viewed as limiting the scope of any other Request.

8.   If no Documents are responsive to a particular Request, You are to state that no responsive Documents exist for that particular Request.

4

9.     If any Document or any part of a Document responsive to a Request is withheld from production on the basis of any claim of privilege, You shall submit, in lieu of such Document, a written statement identifying: (i) the nature of the privilege (including attorney work product) that is being claimed; (ii) the general subject matter of the Document and a description of the file or other location where it was found; (iii) the type or general nature of the Document (i.e., whether it is a letter, memorandum, invoice, email) and the number of pages of which it consists; (iv) the date of the Document; (v) the author(s) and recipient(s) of the Document; and (vi) the addresses of the Document and any other recipients.

10.    You are further requested to provide all non-privileged portions of Documents containing material over which a claim of privilege has been asserted by excising, concealing, or otherwise protecting the portions for which a privilege is asserted, but only to the extent that such excise, concealment, or other protection is strictly necessary for the purposes of the claim of privilege.

11.    The Requests in this Schedule A are continuing in nature.  If, after producing the requested Documents, You obtain or become aware of any further responsive Documents, You must produce to Defendant such additional Documents.

12.    Unless otherwise indicated, the Documents requested include all Documents in Your possession, custody, or control. Without limitation of the terms "possession, custody, or control," as used in the preceding sentence, a Document is in Your possession, custody, or control if You have actual possession or custody or the right or practical ability to obtain the Document or a copy thereof upon demand from one or more of Your affiliates, parents, subsidiaries, divisions, related companies, predecessors-in-interest, officers, directors,

employees, agents, consultants, representatives, independent contractors, advisors, attorneys, or any other person or public or private entity that has actual physical possession thereof.

13.   If a Document is partially responsive, the whole Document shall be produced with no redactions for responsiveness.

14.   Any responsive Documents are to be promptly produced to the attention of Mr. Ancira's counsel:  Kevin M. Smith and David Norman-Schiff, Wiggin and Dana LLP, One Century Tower, 265 Church Street, New Haven, Connecticut, 06510.

## CATEGORIES OF DOCUMENTS TO BE PRODUCED

1.    All Transactional Data for the UBS Account from March 1, 2012 through August 31, 2013, including but not limited to incoming and outgoing wire, securities and cash transfers, irrespective of currency.

2.    All Documents and Communications concerning the Subject Transactions from March 1, 2012 through August 31, 2013 (unless otherwise specified), including but not limited to:

   a.    Transactional Data;

   b.    Copies of all SWIFT Message Type ("MT") 100s, 200s and 900s relating to each Subject Transaction;

   c.    Any Documents and Communications concerning the (i) amount of each Transaction; (ii) date of each Transaction; (iii) originating (in the case of inflows) or recipient (in the case of outflows) account(s) for each Transaction; (iv) beneficial owner(s) of the originating or recipient account(s) for each Transaction; (v) identity of intermediary bank(s) for each Transaction; (vi) stated purpose or reason for each Transaction, and any other details relating thereto; (vii) special instructions relating to each Transaction; and (viii) any other details provided for each Transaction;

   d.    Any Documents and Communications between UBS and UBS Account Representatives as well as those exchanged among UBS employees (e.g., between Compliance Officers and the relationship managers ("RM[s]") for the UBS Account) regarding the Subject Transactions, including but not limited to discussions concerning the purpose, origin (in the case of inflows) or destination (in the case of outflows) of the Transactions;

7

e.      Any Contracts, Agreements or Invoices relating to, supporting, or purporting to justify each Subject Transaction;

f.      Any Documents and Communications concerning the identity of the individuals or entities that approved and/or authorized each Subject Transaction, including but not limited to Communications exchanged between UBS and UBS Account Representatives and internally among UBS employees;

g.      Any Documents and Communications concerning due diligence performed by UBS in connection with the Subject Transactions from March 1, 2012 through the present, including but not limited to Communications exchanged between UBS and UBS Account Representatives and internally among UBS employees;

h.      Any Documents and Communications concerning any Know-Your-Customer ("KYC") information relating to the individuals or entities that approved and/or authorized each Subject Transaction, including but not limited to copies of UBS due diligence reports, third-party reports (if any) and information that UBS identified through open source searches (e.g., WorldCheck, Lexis-Nexis, Google), both at the time of account opening and in connection with periodic client reviews post-account opening (if any), as well as Communications exchanged between UBS and UBS Account Representatives and internally among UBS employees;

i.      Any Documents and Communications concerning any anti-money laundering ("AML") alerts triggered by UBS's transaction monitoring system in connection with the Subject Transactions (including copies of the AML alerts and explanations provided in response to any such alerts by UBS personnel and UBS Account

Representatives) and any AML and due diligence investigations that UBS conducted in connection with each such alert;

j.   Any Documents and Communications concerning any suspicious activity reports ("SARs") filed with the relevant money laundering authority in connection with each Subject Transaction from March 1, 2012 through the present; and

k.   Any other Documents and Communications concerning any divergent, errant, or otherwise suspicious Subject Transaction(s).